SHAVER TRANSPORTATION
COMPANY, Plaintiff,

v.

LOUIS DREYFUS CORPORATION, and
Lees-Carney & Co., Defendants.

LOUIS DREYFUS CORPORATION,
Third-Party Plaintiff,

v.

WESTERN GRAIN EXCHANGE, INC.,
and Condon Grain Growers, Inc.,
Third-Party Defendants.

Civ. No. 74–862.

United States District Court,
D. Oregon.

May 25, 1976.

Floyd A. Fredrickson, John R. Dudrey, Fredrickson, Tassock, Weisensee, Barton & Cox, Portland, Or., for plaintiff.

Dennis Lindsay, Daniel H. Skerritt, Lindsay, Nahstoll, Hart & Krause, Portland, Or., for defendant and third-party plaintiff Louis Dreyfus Corp.

Norman J. Wiener, Peter C. Richter, Miller, Anderson, Nash, Yerke & Wiener, Portland, Or., for defendant Lees-Carney & Co. and third-party defendant Western Grain Exchange, Inc.

J. Brad Littlefield, Portland, Or., for third-party defendant Condon Grain Growers Inc.

## OPINION

SOLOMON, District Judge:

Shaver Transportation Company (Shaver) sued two grain merchants, Louis Dreyfus Corporation (Dreyfus) and Lees-Carney & Co. (Lees-Carney), to collect demurrage charges for delays in the unloading of two barges.[1] Dreyfus filed third-party complaints against Condon Grain Growers, Inc. (Condon) and Western Grain Exchange, Inc. (Western). Admiralty jurisdiction is invoked under 28 U.S.C. § 1333.

The facts are largely undisputed.

*Bill of Lading No. 385 and Barge ST 32*

Before February 16, 1974, Lees-Carney bought grain from Condon. Lees-Carney arranged for Shaver to transport the grain by barge down the Columbia River from Biggs to Portland, Oregon. Also before February 16, Lees-Carney resold the grain to Cook Industries, Inc. (Cook).

Cook sold the grain to another buyer who then resold it, and it was eventually bought by Dreyfus.

On Bill of Lading No. 385 (B/L 385), Condon signed as shipper, Shaver signed as carrier, Lees-Carney was named original consignee, and Cook was named ultimate consignee.

Bill of Lading No. 385 reads in part: It is agreed that the custody and carriage of the goods are subject to all the terms and conditions of this Bill of Lading . . . and to all of the terms and conditions of all the provisions of carrier's applicable, published tariffs and rules pertaining thereto . . . all of which shall govern the relations, whatsoever they may be, between the Carrier, on the one hand, and the Shipper, consignee and goods on the other, in every contingency

· · · · ·

The "applicable, published" tariff on which Shaver bases its claims here was Tariff No. 78. It was published by the Pacific Inland Tariff Bureau, Inc., as agent for many barge companies, including Shaver. Item No. 145 of this tariff was issued June 6, 1973, and became effective July 31, 1973. The Item read in part:

UNLOADING TIME, ALLOWANCES OR CHARGES FOR

All shipments of grain . . . are accepted for transportation subject to the following conditions with respect to dispatch or delay in unloading of carrier's barges:

(A) The carrier shall notify the consignee or unloading terminal [of availability for discharge].

(B) The following allowances or charges will be made to the consignee dependent upon the time taken to discharge the carrier's barge(s):

[In essence, the table provided that if the discharge were made within 48 hours, the consignee would receive an allowance; if between 48 and 72 hours,

---

1. Demurrage is: "A fixed sum, per day or per hour, agreed to be paid for the detention of a vessel under charter at the expiration of lay-days." R. de Kerchove, International Maritime Dictionary 212 (2nd ed. 1961). The opposite of demurrage is dispatch money.

neither an allowance nor a charge; if more than 72 hours, the consignee would pay a charge—the demurrage.]

.    .    .    .    .

(D) All allowances or charges are for the account of the consignee.

The grain in B/L 385 was loaded on Shaver's Barge ST 32 at Biggs, Oregon, on February 16, 1974. Lees-Carney received B/L 385 on February 19, 1974, and delivered it to Cook the next day.

Barge ST 32 arrived in the Portland harbor on February 19, 1974. Shortly before the barge arrived in Portland, Shaver was told that Dreyfus had become the ultimate consignee of the grain. Shaver therefore asked Dreyfus for instructions and was told to spot Barge ST 32 at the Dreyfus elevator for unloading. The barge was so spotted, and Dreyfus received a copy of B/L 385 on Feburary 21, 1974.

During this period, grain shipments reached record levels. Dreyfus's elevator was "plugged up" with grain, and some of the ocean-going vessels scheduled to take grain off were delayed in arriving. As a result, Dreyfus could not receive Barge ST 32's grain. The barge was not completely unloaded at the elevator until March 14, 1974.

### Bill of Lading No. 2–7 and Barge ST 36

On or before February 19, 1974, Western sold grain to Dreyfus. Western contracted with Shaver to ship the grain from Port Central Ferry, Washington, to the Dreyfus elevator in Portland.

Shaver loaded Barge ST 36 on February 19 and 20, 1974; on February 20 Western signed B/L 2–7 as shipper and Shaver signed as carrier. Dreyfus was named as consignee. The standard portions of B/L 2–7 were identical with those of B/L 385.

Barge ST 36 arrived at the Dreyfus elevator on February 21, 1974, and notified Dreyfus that it was ready for unloading.

Dreyfus received B/L 2–7 on February 22, 1974, but Dreyfus did not completely unload Barge ST 36 until March 13, 1974.

Shaver billed Dreyfus $1,697.73 for 20 days' demurrage on Barge ST 32, and Shaver billed Dreyfus $3,503.89 for 17 days' demurrage on Barge ST 36. Dreyfus refused to pay, and this action followed.

On both bills of lading Shaver contends that Dreyfus as ultimate consignee is liable for the demurrage charges, even though Dreyfus did not expressly agree to pay those charges.

On B/L 385 Shaver alternately contends that Lees-Carney as original consignee became liable for the demurrage charges when it diverted the shipment of grain on Barge ST 32 to an ultimate consignee (Dreyfus) which delayed in receiving the grain.

Dreyfus makes five contentions.

*First*: Tariff No. 78 represents price-fixing among horizontal competitors and is a per se violation of § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. Before the trial, Dreyfus moved to amend its answer and raise a counterclaim by adding this antitrust contention. This motion was denied, and I shall not reconsider it here.

■ *Second*: Western and Condon both failed to notify Dreyfus of the grain shipments before they were loaded at Biggs, Oregon, and Port Central Ferry, Washington. As a result, Dreyfus could not exercise its right, under the contracts of purchase and ORS 72.3190, to name the vessels by which the grain moved.[2]

Probably the grain had already been loaded on Shaver's barges when Dreyfus became the purchaser. In any event, the failure to notify Dreyfus of the shipments was immaterial. Dreyfus's export manager testified that barges were never delayed at Dreyfus's Portland elevator merely because they belonged to one barge company rather than another. Even if the failure to notify

**2.** Dreyfus had a five-year contract with Tidewater Barge Lines, Inc., giving Dreyfus priority in using six of Tidewater's 20 barges. Since the spring of 1974, Dreyfus pays demurrage and collects dispatch only with Tidewater, its contract carrier. Presumably, Dreyfus would have named Tidewater vessels to move the grain.

was material, Dreyfus waived any objections by accepting delivery of the grain on Shaver barges.

■ *Third* : It cannot be liable for demurrage by statute because by 1974 both the federal government and the State of Oregon had deregulated the carriage of bulk commodities by water;[3] therefore, "there is no statutory basis for Shaver's attempt to impose liability on [Dreyfus] through the device of a tariff."

Published tariffs are not invalid because bulk water carriers are no longer required to publish their tariffs following state and federal deregulation. Here, Shaver does not seek to impose liability unilaterally, through a tariff, but only through contracts which incorporated the terms of a tariff that required the ultimate consignee to pay demurrage.

*Fourth* : Dreyfus cannot be liable for demurrage by contract because it was not a party to either contract; Shaver must therefore look to Condon and Western, with whom it had contracts, to pay demurrage.

*Fifth* : It cannot be liable for demurrage by custom because no custom existed.

I find that there was a long-established custom in the grain trade on the Columbia and Willamette Rivers that the consignee who unloads a barge is required to pay demurrage for delays in unloading at the consignee's facilities.

■ I further find that the word "consignee", when used in standard bills of lading requiring consignees to pay demurrage, referred to the "ultimate consignee," the one who unloaded the barge. This custom was incorporated in the tariffs under which the various barge lines operated, including Item No. 145 of Tariff No. 78. Dreyfus was well aware of this custom and on many occasions paid demurrage under this custom.

■ When Dreyfus accepted the bills of lading without objection and spotted the barges at its elevator, it knew that, as the ultimate consignee, it would have to pay demurrage. When Dreyfus, with this knowledge, detained the barges for nearly three weeks, it impliedly agreed to pay demurrage charges.

Plaintiff Shaver is therefore entitled to a judgment against defendant Dreyfus for $5,201.62 with interest. Shaver's action against Lees-Carney is dismissed. Dreyfus's third-party actions against Condon and Western are also dismissed. No costs.

This opinion shall constitute findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

---

3. On December 27, 1973, Congress removed the carriage of bulk commodities by water from the jurisdiction of the ICC. Pub.L. 93–201, § 1, 87 Stat. 838 (1973), *amending* 49 U.S.C. § 903(b). Oregon had also deregulated water carriers in 1961. Chapter 321, Oregon Laws 1961, *repealing* ORS Chapter 769.